Aderemilekun Omojola, Esq. – Attorney ID No. 040002011
Abira Medical Laboratories, LLC d/b/a
Genesis Diagnostics
957 Route 33 | Suite 12 | #322
Hamilton Square | New Jersey | 08690
Tel: 212.220.1616 | Fax: 609.798.0327
aomojola@genesisdx.com
Counsel for Abira – Abira Medical Laboratories, LLC d/b/a Genesis Diagnostics

**UNITED STATED DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON**

| | |
|---|---|
| ABIRA MEDICAL LABORATORIES, LLC d/b/a GENESIS DIAGNOSTICS,<br><br>Plaintiff<br><br>vs.<br><br>CORESOURCE, INC., AND ITS AFFILIATES, ABC COMPANIES 1-100 AND JOHN DOES 1-100,<br><br>Defendants. | CASE NO. 3:23-cv-03777-RK-TJB<br><br><br>AMENDED COMPLAINT; DESIGNATION OF TRIAL COUNSEL; DEMAND FOR RELIEF, AND DISCOVERY REQUESTS.<br><br><br>JURY TRIAL DEMANDED |

### I. <u>INTRODUCTION</u>

1.      Defendants, being health insurance companies, third-party administrators, health and welfare funds, or even self-insured employers, providing health insurance services to their members, intentionally and unlawfully denied benefits to their insureds/claimants, by failing to pay to Abira Medical Laboratories, LLC ("Abira") d/b/a Genesis Diagnostics, for laboratory testing of specimen, including but not limited to COVID-19 tests, which Abira performed for the insureds/claimants.

2.      Defendants have contractual obligations to the natural person Insureds/claimants.

3.      To the extent that the contracts relevant to the underlying claims are governed by ERISA, this action is brought to: 1) recover benefits pursuant to U.S.C. § 1132(a)(1)(B), and

2) for equitable relief, pursuant to U.S.C. § 1132(a)(3).

4.     Pursuant to 29 C.F.R. § 2560.503–1(b)(4), Abira is an "authorized representative" acting on behalf of the insureds/claimants for any necessary legal action, to secure for the insureds/claimants, the benefits that they already paid for under the contracts with the Defendants.

5.     For the purpose of their claims, the insureds/claimants designated Abira as their assignee, as evidenced by the insureds/claimants providing their insurance information to Abira, for the purpose of Abira filing claims with the Defendants for payment of lab tests, which the insurance contracts require Defendants to cover.

6.     Simply put, the Benefits section of the insurance contracts which the insureds/claimants paid for, require Defendants to cover, that is, pay for their specimen testing; the insureds/claimants received specimen testing services from Abira – But since their contracts require Defendants to pay for the testing, they needed an insurance claim to secure the contracted payments from the Defendants, and the insureds/claimants assigned their contractual rights to Abira, and they designated Abira as an "authorized representative" under 29 C.F.R. § 2560.503-1(b)(4), to process their insurance claims and on behalf of the insureds/claimants, collect the contracted payments from Defendants.

7.     Abira exhausted the administrative remedies over nonpayment of these claims, by filing appeals when the claims were denied, thus preserving this action with regard to over 110 claims underlying this action, and any applicable statute of limitations.

8.     Finding that Families First Coronavirus Response Act ("FFRCA") and Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") modified the insurance plans by requiring insurance companies to cover COVID-19 testing, this Court has ruled that plan participants – and health providers – could sue under ERISA, after a health insurer denied coverage for their COVID-19 testing. *Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health and Life Insurance Company*, 2022 WL 1567797, at *6 (D.N.J May 18, 2022).

9.    Abira seeks benefits under U.S.C. § 1132(a)(1)(B), and equitable relief U.S.C. § 1132(a)(3), in the amount of $289,678.

10.   Abira is also entitled to attorney fees and costs of suit pursuant to 29 U.S.C. § 1132(g)(1), and other legal or equitable relief as this court deems appropriate, pursuant to 29 U.S.C. § 1132(g)(2)(E).

## II. PARTIES

### ABIRA

11.   Abira, Abira Medical Laboratories, LLC ("Abira") d/b/a Genesis Diagnostics is a domestic limited liability company organized under the laws of the State of New Jersey.

12.   Several of Abira's administrators and decision-makers live in New Jersey, work in New Jersey, and run Abira's affairs from New Jersey.

### DEFENDANTS

13.   Defendant CoreSource, Inc. provides health insurance services throughout New Jersey, including without limitation, Mercer County, and has its principal place of business at 35601 Mound Road, Sterling Heights, Michigan, 48310.

14.   Defendants are affiliates, or they own each other, or they are aliases ("a/k/a") of each other, or they are doing business as ("d/b/a") each other.

15.   Abira is unaware of the true names and capacities of Defendants named herein as ABC Companies 1 through 100 and JOHN DOES 1 through 100, inclusive, and therefore asserts claims against these Defendants by such fictitious names.

16.   Abira will amend this Complaint to show the true names and capacities of such ABC Companies and JOHN DOES when the same have been ascertained.

17.   Abira, on information and belief, alleges that each of the fictitiously named Defendants is responsible in some manner for the actions and occurrences herein alleged, and that Abira's damages were proximately caused by their acts.

18.     On further information and belief, Abira alleges that at all times herein mentioned, the ABC Companies and JOHN DOE Defendants acted in concert with, and were/was the agent, employee, contractor, partner, servant, employee and/or representative, with the permission and consent of the other Defendants.

### III.  JURISDICTION AND VENUE

19.     Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing Fed. R. Civ. P. 4(k)(1)(A)).

20.     Moreover, this Court "may exercise in personam jurisdiction over a non-resident defendant 'consistent with due process of law.'" Bayway Refining Co. v. State Utilities, Inc., 333 N.J. Super. 420, 428 (App. Div. 2000).

21.     The paradigm forums, in which a corporation is reasonably regarded as at home, are the place of incorporation and the principal place of business. *Daimler AG v. Bauman*, 571 U.S. 137, 125 (2014).

22.     "In an 'exceptional case,' a corporate defendant's operations in another forum 'may be so substantial and of such a nature as to render the corporation at home in that State.'" *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler*, 571 U.S. at 139 n.19).

23.     The analysis of whether a forum state has sufficient minimum contacts to exercise specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (quoting *Shaffer*, 433 U.S. at 204).

24.     There are substantial operations in New Jersey, between Abira (a New Jersey corporation) and Defendants; the only member listed on Abira's Articles of Incorporation, who is also Abira's vice president, along with several of Abira's administrators and decision-makers live in New Jersey, work in New Jersey, and run Abira's affairs from New Jersey.

25.    [A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." _Walden v. Fiore_, 571 U.S. 277, 284 (2014).

26.    Between 2017 and 2019 Defendants' representatives communicated with Abira's representatives regarding claims submitted by Abira, with Defendants' representatives directing Abira to file submit medical records to support the claims; the claims were then resubmitted or appeals were filed, which were considered by Defendants' employee/representatives on 110 outstanding claims, which further supports contact and this court's jurisdiction over this matter.

27.    Defendants processed and paid several claims that were submitted by Abira, which taken with the other factors is sufficient to establish contacts in New Jersey, for jurisdictional purposes.

28.    Moreover, ERISA is unique in having relaxed jurisdictional requirements, as it was designed to remove jurisdictional and procedural obstacles that would hinder effective enforcement[1]; this is reflected directly in the code:

i. 29 U.S.C. § 1132(e)(2) – "Where an action under this subchapter is brought in a district court of the United States, it may be brought in the district where the plan is administered, where the breach took place…,

and

ii. 29 U.S.C. § 1132(f) "the district courts of the United States shall have jurisdiction, **without respect to the amount in controversy or the citizenship of the parties**, to grant the relief provided for in subsection (a) of this section in any action."

## IV.  FACTS

29.    Abira operated a licensed medical testing laboratory business, which provided services nationwide, with approximately 150 employees, including but not necessarily limited to physicians, scientists, technicians, administrative personnel, and sales representatives.

---

[1] Senate Report No. 127, 93rd Congress, 1st Session (1973), in 1974 U.S. Code Cong. & Ad. News 4871.

30.     As part of its business model, Abira performed clinical laboratory, toxicology, pharmacy, genetics, and addiction rehabilitation testing services on specimen submitted for numerous insureds/claimants located throughout the United States (the "Laboratory Testing Services").

31.     At the advent of the COVID-19 pandemic, in addition to its pre-existing schedule of specimen tests, Abira offered COVID-19 testing, as part of its contribution to combatting the COVID-19 pandemic.

32.     Abira obtained regulatory approvals and emergency use authorizations from numerous states to provide COVID testing and reporting on a timely basis, with monthly reauthorizations and renewals, which required test results to be reported within specified time constraints, in order to grant reauthorization.

33.     Additionally, Abira held a regional designation to perform first responder testing for police, firefighters, and healthcare workers, and provided testing for prison systems in multiple counties, including in New Jersey.

34.     Physicians and patients relied upon Abira to rapidly provide the results from Laboratory Testing Services in order to inform medical decisions on patient care and public safety.

35.     Additionally, various businesses, such as nursing homes, sent tens of thousands of daily specimens to Abira, for timely results that informed whether to isolate or hospitalize insureds/claimants, to limit infection, avoid the spread of the COVID-19 virus, and death.

36.     The insurance contracts between the insurance companies and the insureds/claimants include Benefits clauses or provisions, which require the Defendants to pay for laboratory testing of the insureds'/claimants' specimen.

37.    The claims underlying this action originated when:

i. the insureds/claimants submitted specimen via molecular swabs, blood samples, etcetera at physicians' offices or at a facility, and they were shipped to the laboratory.

ii. as the insurance contracts include Benefits clauses or provisions requiring the Defendants to pay for the laboratory testing of the insureds'/claimants' specimen, the insureds/claimants provided their insurance information to Abira, to collect payment from the Defendants.

iii. the laboratory tested the specimens, provided the results to the appointed recipients, and submitted the bill, typically called a claim, to the Defendants for payment.

iv. Pursuant to the Benefits clauses or provisions of the insurance contracts, Defendants were supposed to pay, on behalf of the insureds/claimants, the in-network price of the lab testing services Abira provided to the insureds/claimants, or where applicable, the reasonable or customary out-of-network fee for Abira's lab testing services.

38.    As the Defendants are required under the Benefits clauses in the insurance contracts to pay for the laboratory testing of the insureds'/claimants' specimen, the insureds/claimants designated Abira as an assignee of the insurance contracts, as evidenced by providing their insurance information to Abira, specifically for Abira to claim payments from the Defendants for the lab tests.

39.    In addition to being an authorized representative of the claimants pursuant to 29 C.F.R. § 2560.503–1(b)(4), when the insureds/claimants designated Abira as an assignee of the insurance contracts, this did in fact put Abira in privity of contract with the Defendants to be paid for the lab tests.

40.     The Defendants were supposed to pay the claims, pursuant to Abira's fee schedule or the insurer's fee schedule, or typically, negotiate a reasonable fee.

41.     Where Defendant is an insurer, it failed to pay Abira directly for claims Abira submitted for its laboratory testing of the insureds'/claimants' specimens.

42.     Where Defendant is a third-party administrator, it acted as an agent of the insurer, furnished by the insurer with the necessary funds to perform the administrative service of processing and paying claims on the insurer's behalf, but for avarice, the third-party administrator failed to process and pay said claims.

43.     Defendants were supposed to verify and honor the claims submitted by the laboratory, but instead, they:

    i. entered into insurance contracts with the insureds/claimants, by which they communicated to the insureds/claimants, that pursuant to Benefits clauses or provisions of contract, if the insureds/claimants got tested and gave the lab their insurance information, the insurer would pay the lab when it submits its claims to the insurer for laboratory testing it performed;

   ii. Defendants knew that the representations and promises made to the insureds/claimants via the insurance contracts were misrepresentations and false promises, with regard to paying for their laboratory testing, and knew that such would not be honored;

  iii. Defendants intended for the insureds/claimants to rely on the promises and representations communicated to the insureds/claimants via the insurance contracts, that the insurer would pay the lab when it submits its invoice or claims to the insurer for laboratory testing it performed;

   iv. The insureds'/claimants' reliance on the Defendants promises were reasonable, because they made the premium payments to the Defendants, submitted their

specimen to Abira for testing, and designated Abira as an assignee/authorized representative of the insurance contracts pursuant to 29 C.F.R. § 2560.503–1(b)(4), to process payment for the lab testing, as evidenced by providing their insurance information to Abira;

v. Ultimately, the Defendants damaged the insureds/claimants by refusing to pay Abira, for the laboratory testing performed for the insureds/claimants, and also damaged Abira, who came into privity of contract with the Defendants as an assignee of the insured.

44.    The dates of service for the claims underlying this action are from 2016 through 2020.

45.    In 2019, however, Defendants processed some claims and actually sprinkled payments of claims to Abira, and again paid some claims 2020, so that**:**

i. by processing/payment and the communication involved with Abira's claim submission, plus Defendants' representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims;

ii. whereas Defendants representatives knew that they merely induced Abira to continue to provide specimen testing to their insureds/claimants, from whom they collected premium payments for the insurance contracts, but Defendants intended to watch Abira's claims grow, knowing that they would later refuse to pay Abira for a substantial amount of outstanding claims;

iii. the Defendants engaged in the processing/payment of Abira's claim and the intermittent communication representing to Abira that they would continue to pay

subsequent claims, with the intention that Abira would rely on such, to continue

providing testing services to Defendants' insureds/claimants,

iv. Even as the claims grew, due to prior processing/payment, and communication

from Defendants' representatives (including but not limited to "Brandy" regarding

a 2018 claim, "Mary" regarding a 2019 claim), advising that claims submitted need

medical records for approval, which Abira's representatives then resent via

facsimile, Abira reasonably relied on the Defendant to pay subsequent and

outstanding claims;

v. Defendants then allowed Abira's claims to grow substantially and caused financial

damage to Abira, by refusing to pay Abira for the substantial outstanding claims.

46.     With regard to those claims arising from the COVID-19 pandemic, Congress took

extraordinary steps to require health plans and health insurance issuers like Defendants to cover

and pay for coronavirus testing.

47.     Consequently, Congress prohibited health plans and health insurance issuers from

imposing any prior authorization or other medical management requirements on testing for the

diagnosis of COVID-19. See FFCRA § 6001(a).

48.     Congress clarified that group health plans and health insurance issuers like

Defendants must cover and reimburse COVID-19 testing and related services, which were laid out

not just in the text of the FFCRA and CARES Act, but also in a series of "Frequently Asked

Questions" ("FAQs") documents issued and publicly posted by the federal Department of Health

and Human Services ("HHS").

49.     Pursuant to Section 6001 of the FFCRA, as amended by Section 3201 of the

CARES Act, Defendants must provide benefits for certain COVID-19-related items and services,

including COVID-19 testing, furnished starting from March 18, 2020.

50.     Specifically, Defendants "must provide this coverage without imposing any cost-sharing requirements (including deductibles, copayments, and coinsurance), prior authorization, or other medical management requirements." See FFCRA, § 6001(a); FAQs About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Act Implementation (hereinafter "FAQs"), Part 44, pg. 1-2, February 26, 2021.

51.     Moreover, the FAQs clarify that plans and issuers are prohibited from imposing specific screening criteria on coverage of COVID-19 diagnostic testing for an asymptomatic person who has no known or suspected exposure to COVID-19. *Id.* at pg. 2, Q1.

52.     Thus, "[w]hen an individual seeks and receives a COVID-19 diagnostic test from a licensed or authorized health care provider, or when a licensed or authorized health care provider refers an individual for a COVID-19 diagnostic test, plans and issuers generally must assume that the receipt of the test reflects an 'individualized clinical assessment' and the test should be covered without cost sharing, prior authorization, other medical management requirements." *Id.* at pg. 2-3.

53.     Federal guidance under the FFCRA and CARES Act is also clear that Defendants' obligation extends to a wide array of coverage and testing types; the FFCRA/CARES Act payment rules apply to "group health plans and health insurance issuers offering group or individual health insurance coverage (including grandfathered health plans)," which specifically includes "both insured and self-insured group health plans," including "private employment-based group health plans (ERISA plans), non-federal governmental plans...and church plans." See FAQs, Part 42, Q1, pg. 2-3, April 11, 2020.

54.     Defendants' reimbursement obligations also apply to all manner of COVID-19 diagnostic testing, including serological (otherwise known as "antibody") testing, and tests administered at home through self-collection. See FAQs, Part 42, Q1, pg. 2-3, April 11, 2020; FAQs, Part 43, Q4, pg. 6, June 23, 2020.

55.    Regulators have even warned that plans and issuers shall not attempt to "limit or eliminate other benefits . . . to offset the costs of increasing the generosity of benefits related to the diagnosis and/or treatment of COVID-19." See FAQs, Part 42, Q9, pg. 7-9, April 11, 2020.

56.    There can be no debate that FFRCA and CARES Act require Defendants to pay for the COVID-19 testing services which Abira provided.

57.    Abira had every expectation that Defendants would honor their obligations and properly reimburse Abira for the COVID-19 testing services it provided to Defendants' insureds/claimants.

58.    Defendants, however, failed to pay Abira for its services, including but not limited to COVID-19 diagnostic testing that Abira provided to Defendants' insureds/claimants.

### V.  CAUSES OF ACTION

59.    The causes of action are brought pursuant to 29 U.S.C. § 1132(a)(1)(B), and 29 U.S.C. § 1132(a)(3) of ERISA.

### COUNT ONE
~
### BREACH OF CONTRACT

60.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45.

61.    In order to properly plead a claim for breach of contract, a plaintiff must allege (1) a contract (2) a breach of that contract (3) damages flowing there from and (4) that the party performed its own contractual duties." *Video Pipeline, Inc. vs. Buena Vista Home Entertainment, Inc,* 210 F. Sup. Second 552, 561 (D.N.J. 2002).

62.    The Benefits clause in the valid and binding insurance contracts and insurance plans which the insureds/claimants paid for, require the Defendants to cover – that is, to pay, for the laboratory testing of the insureds'/claimants' specimen.

63.     The insureds/claimants assigned to Abira, the right to file insurance claims for the lab testing, as evidenced by providing to Abira, the necessary insurance information for Abira to file the claims and collect the payments on behalf of the insureds.

64.     Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds appointed Abira as their "authorized representative," for the purpose of their insurance claims to secure Defendants' payment for the lab tests of their specimen.

65.     Consequently, or alternatively, Abira entered into privity with Defendants, so that Abira is entitled to prompt processing and payment of the claims for lab testing services rendered to Defendants' insureds/claimants.

66.     Defendants, however, repeatedly breached the insurance contracts by either failing to respond at all to properly submitted claims or, for those claims in which Defendants did choose to respond, regularly refusing to pay claims submitted by Abira, for reasons that were (and remain) entirely groundless.

67.     Due to Defendants' multiple breaches of the insurance contracts, the insureds/claimants have been deprived of payments for lab testing Abira provided to the insureds/claimants, which the insureds/claimants authorized Abira to collect on their behalf, pursuant to 29 C.F.R. § 2560.503–1(b)(4).

68.     Due to Defendants' multiple breaches of the insurance contracts, Abira has been deprived of payment for the insurance claims, which the insureds/claimants assigned Abira to collect on their behalf.

69.     Defendants made no payments on the balance due and owing, which totals $289,678, for services rendered by Abira to Defendants' insureds/claimants.

70.     Defendants' failure to pay Abira as required under the insurance contracts (and applicable law) caused the insured/claimants and Abira to suffer damages, in the amount of $289,678.

## COUNT TWO
~
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

71.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45, and paragraphs 60 through 70.

72.    Implied in all contracts is a covenant of good faith and fair dealing.

73.    Under New Jersey law, every party to a contract is "bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. vs. Route 18 Shopping Ctr. Assocs.*, 182 N.J. 210, 224 (2005).

74.    Defendants' actions here, including but not limited to, failure and/or refusal to respond at all to properly submitted claims, or for those claims in which Defendants did choose to respond, regularly refusing to pay claims submitted by Abira for reasons that were (and remain) entirely groundless, breached the implied covenants.

75.    Consequently, Defendants caused the insured/claimants and Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

## COUNT THREE
~
## FRAUDULENT MISREPRESENATION

76.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, paragraphs 36 through 45, and paragraphs 60 through 70.

77.    Defendants promised the insureds/claimants in the Benefits clause of the insurance contracts, that they would cover for the insureds/claimants, the cost of lab tests for specimen.

78.    Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds/claimants appointed Abira as an "authorized representative," to process their insurance claims, for Defendants to pay for the lab tests, which also made Abira an assignee of the insureds'/claimants' rights in this regard.

79.    Whereas there are 110 claims outstanding, over the years Defendants sprinkled payments to Abira, and Defendants' representatives (including but not limited to "Brandy"

regarding a 2018 claim, "Mary" regarding a 2019 claim) advised that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus impressing upon Abira that they would pay Abira for the lab testing services provided to Defendants' insureds/claimants.

80.    Whereas Defendants knew that they merely intended for the insureds/claimants to rely on their representations in the insurance contracts, and subsequently for Abira, to rely on their representations, knowing that Defendants would later refuse to pay a substantial amount of claims that would grow over time.

81.    The insureds/claimants, and subsequently Abira, relied on Defendants' representations, in good faith, and such reliance was reasonable and justified.

82.    Defendants have therefore fraudulently induced the insureds/claimants to pay insurance premiums, and with Defendant's representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus Defendant induced Abira to continue to perform laboratory testing services for Defendants' insureds/claimants, for which Defendants had no intention to pay, and for which Defendants, in fact, did not pay Abira, and the substantial amount of claims Abira submitted to them on behalf of the insureds/claimants.

83.    Consequently, Defendants caused the insured/claimants and Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

**COUNT FOUR**
~
**NEGLIGENT MISREPRESENATION**

84.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45, and paragraphs 76 through 83.

85.    To establish a claim for negligent misrepresentation, a plaintiff must show that `[a]n incorrect statement, [was] negligently made and justifiably relied on." *Kaufman v. I-Stat Corp.*, 165 N.J. 94 (2000).

86.    Defendants promised the insureds/claimants in the Benefits clause of the insurance contracts, that they would cover for the insureds/claimants, the cost of lab tests for specimen.

87.    Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds/claimants appointed Abira as an "authorized representative," to process their insurance claims, for Defendants to pay for the lab tests, which also made Abira an assignee of the insureds'/claimants' rights in this regard.

88.    Whereas there are 110 claims outstanding, over the years Defendants sprinkled payments to Abira, and Defendants' representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advised that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus impressing upon Abira that they would pay Abira for the lab testing services provided to Defendants' insureds/claimants.

89.    Whereas Defendants knew that they merely intended for the insureds/claimants to rely on their representations in the insurance contracts, and subsequently for Abira, to rely on their representations, knowing that Defendants would later refuse to pay a substantial amount of claims that would grow over time.

90.    The insureds/claimants, and subsequently Abira, relied on Defendants' representations, in good faith, and such reliance was reasonable and justified.

91.    Defendants have therefore fraudulently induced the insureds/claimants to pay insurance premiums, and with Defendant's representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus Defendant induced Abira

to continue to perform laboratory testing services for Defendants' insureds/claimants, for which Defendants had no intention to pay, and for which Defendants, in fact, did not pay Abira, and the substantial amount of claims Abira submitted to them on behalf of the insureds/claimants.

92.     Consequently, Defendants caused the insured/claimants and Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

**COUNT FIVE**

~

**PROMISSORY ESTOPPEL**

93.     Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45, and paragraphs 84 through 92.

94.     Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 194 N.J. 223, 253, 944 A.2d 1 (2008).

95.     Defendants promised the insureds/claimants in the Benefits clause of the insurance contracts, that they would cover for the insureds/claimants, the cost of lab tests for specimen.

96.     Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds/claimants appointed Abira as an "authorized representative," to process their insurance claims, for Defendants to pay for the lab tests, which also made Abira an assignee of the insureds'/claimants' rights in this regard.

97.     Whereas there are 110 claims outstanding, over the years Defendants sprinkled payments to Abira, and Defendants' representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advised that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus impressing upon Abira that they would pay Abira for the lab testing services provided to Defendants' insureds/claimants.

98.    Whereas Defendants knew that they merely intended for the insureds/claimants to rely on their representations in the insurance contracts, and subsequently for Abira, to rely on their representations, knowing that Defendants would later refuse to pay a substantial amount of claims that would grow over time.

99.    The insureds/claimants, and subsequently Abira, relied on Defendants' representations, in good faith, and such reliance was reasonable and justified.

100.    Defendants have therefore fraudulently induced the insureds/claimants to pay insurance premiums, and with Defendant's representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus Defendant induced Abira to continue to perform laboratory testing services for Defendants' insureds/claimants, for which Defendants had no intention to pay, and for which Defendants, in fact, did not pay Abira, and the substantial amount of claims Abira submitted to them on behalf of the insureds/claimants.

101.    Defendants, in fact, did not pay Abira for the continued testing, and the substantial amount of claims Abira later submitted to them.

102.    Consequently, Defendants caused the insured/claimants and Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

**COUNT SIX**
~
**EQUITABLE ESTOPPEL**

103.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45, and paragraphs 93 through 102.

104.    To state a claim for equitable estoppel, Plaintiff must allege that Defendant engaged in conduct, either intentionally or under circumstances that induced reliance, and that Plaintiff acted or changed its position to its detriment. *Miller v. Miller*, 97 N.J. 154, 163 (1984);

*Knorr v. Smeal*, 178 N.J. 169, 178 (2003). See also, *Louisiana Counseling and Family Services, Inc. v. Makrygialos, LLC*, 543 F. Supp. 2d 359, 367 (D.N.J. 2008).

105.    As such, [equitable estoppel] is an equitable doctrine founded in the fundamental duty of fair dealing imposed by law, invoked in "the interests of justice, morality and fairness." *Knorr*, 178 N.J. at 169 (quoting *Palatine I v. Planning Bd.*, 39 N.J. 546, 560 (1993).

106.    Defendants promised the insureds/claimants in the Benefits clause of the insurance contracts, that they would cover for the insureds/claimants, the cost of lab tests for specimen.

107.    Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds/claimants appointed Abira as an "authorized representative," to process their insurance claims, for Defendants to pay for the lab tests, which also made Abira an assignee of the insureds'/claimants' rights in this regard.

108.    Whereas there are 110 claims outstanding, over the years Defendants sprinkled payments to Abira, and Defendants' representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advised that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus impressing upon Abira that they would pay Abira for the lab testing services provided to Defendants' insureds/claimants.

109.    Whereas Defendants knew that they merely intended for the insureds/claimants to rely on their representations in the insurance contracts, and subsequently for Abira, to rely on their representations, knowing that Defendants would later refuse to pay a substantial amount of claims that would grow over time.

110.    The insureds/claimants, and subsequently Abira, relied on Defendants' representations, in good faith, and such reliance was reasonable and justified.

111.    Defendants have therefore fraudulently induced the insureds/claimants to pay insurance premiums, and with Defendant's representatives (including but not limited to "Brandy"

regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus Defendant induced Abira to continue to perform laboratory testing services for Defendants' insureds/claimants, for which Defendants had no intention to pay, and for which Defendants, in fact, did not pay Abira, and the substantial amount of claims Abira submitted to them on behalf of the insureds/claimants.

112.    Defendants, in fact, did not pay for the continued testing, and the substantial amount of claims Abira later submitted to them.

113.    Consequently, Defendants caused the insureds/claimants and Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

**COUNT SEVEN**

~

**QUANTUM MERUIT / UNJUST ENRICHMENT**

114.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraphs 36 through 45, and paragraphs 103 through 113.

115.    An unjust enrichment claim consists of three elements: (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying for it. *Mason v. Coca-Cola Co*., 09-cv-0220-NLH, 2010 WL 2674445, at *7 (D.N.J. June 30, 2010).

116.    Per the insurance contracts between the Defendants and the insureds/claimants, Defendants collected insurance premium payments, in exchange for which they were supposed to use a portion of the premium payments they pooled to pay for the laboratory testing services promised under the contracts.

117.    Pursuant to 29 C.F.R. § 2560.503–1(b)(4), the insureds/claimants appointed Abira as an "authorized representative," to process their insurance claims, for Defendants to pay for the lab tests, which also made Abira an assignee of the insureds'/claimants' rights in this regard.

118.    Abira entered into privity of contract with Defendants on the insurance contracts, when the insureds/claimants assigned to Abira, their rights under the clauses of the insurance contracts, which required the Defendants to pay Abira for the insureds'/claimants' lab tests.

119.    To put it simply:

i. the Benefits section of the insurance contracts which the insureds/claimants paid for, require Defendants to cover, that is, pay for their specimen testing;

ii. the insureds/claimants received specimen testing services from Abira;

iii. since their contracts require Defendants to pay for the testing, they needed insurance claims to secure the contracted payments from the Defendants;

iv. the insureds/claimants assigned their contractual rights to Abira, or they designated Abira as an "authorized representative" under 29 C.F.R. § 2560.503-1(b)(4), to process the insurance claims on behalf of the insureds/claimants, and

v. to collect the contracted payments from Defendants.

120.    Defendants have therefore fraudulently induced the insureds/claimants to pay insurance premiums, and with Defendant's representatives (including but not limited to "Brandy" regarding a 2018 claim, "Mary" regarding a 2019 claim) advising that claims submitted need medical records for approval, which Abira's representatives then resent via facsimile, Defendants impressed upon Abira that they would continue to honor the claims; thus Defendant induced Abira to continue to perform laboratory testing services for Defendants' insureds/claimants, for which Defendants had no intention to pay, and for which Defendants, in fact, did not pay Abira, and the substantial amount of claims Abira submitted to them on behalf of the insureds/claimants.

121.    It is against equity and good conscience to permit Defendants to retain the money it intentionally and wrongfully failed to pay for lab tests, on behalf of the insureds/claimants.

122.    By reason of the unjust enrichment by Defendants, the insureds/claimants are entitled to judgment against Defendants in the amount of not less than $289,678, plus interest, which pursuant to 29 C.F.R. § 2560.503-1(b)(4), the insureds/claimants authorized Abira to collect on their behalf.

**COUNT EIGHT**

~

**VIOLATION OF THE FFRCA AND CARES ACT**

123.    Abira realleges and incorporates herein by reference, each of the foregoing allegations, particularly paragraph 8, and paragraphs 46 through 59.

124.    In *Diagnostic Affiliates* in *Open MRI & Imaging of RP Vestibular Diagnostics, P.A. v. Cigna Health and Life Insurance Company*, 2022 WL 1567797, at *6 (D.N.J May 18, 2022), where that Defendant sought dismissal of the FFRCA and CARES Act claims this Court extensively discussed both Act, and quoted the meaningful language of the statutes.

125.    Finding that Families First Coronavirus Response Act ("FFRCA") and Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") modified the insurance plans by requiring insurance companies to cover COVID-19 testing, this Court has ruled that plan participants – and health providers – could sue under ERISA, after a health insurer denied coverage for their COVID-19 testing.

126.    Thus, this Court rejected Cigna's argument that Congress, displaced any private right of action to enforce the coverage mandate, by granting enforcement authority to government agencies.

127.    The Court's view was that in interpreting ERISA, FFRCA and the CARES Act together, Congress did not displace the existing private right of action under ERISA by granting "additional" enforcement authority to the agencies in the FFRCA and CARES Acts.

128.    In other words, as the Court expressly stated, "… the bottom line [is that] Congress mandated that health insurance plans cover COVID-19 testing [through the FFCRA and CARES

Acts], raising it to the status of a benefit of those plans. Congress also allows insureds to sue for benefits due to them." *Id.*

129.    Defendants offer group health plans and constitute a health insurance issuer offering group or individual health insurance coverage, as those terms are defined under Section 6001 of the FFCRA.

130.    The COVID-19 testing services that Abira provided to Defendants' insureds/claimants constitute in vitro diagnostic products for the detection of COVID-19 or the diagnosis of the virus that causes COVID–19, as provided by Section 6001 of the FFCRA.

131.    Despite numerous and persistent demands and requests, Defendants have failed and refused to pay, and/or have underpaid, Abira for providing its COVID-19 testing services.

132.    By failing and refusing its payment obligations under the FFRCA and CARES Act, Defendants deprived Abira of compensation, and caused Abira to suffer damages, for which Defendants are liable, in the amount of $289,678.

## VI.  <u>DEMAND FOR RELIEF</u>

**WHEREFORE**, the above premises being considered, Plaintiff prays for judgment against Defendants, jointly and/or severally, and requests the following:

> i.    Benefits due to the insureds/claimants, cumulatively in the amount of $289,678, pursuant to 29 U.S.C. § 1132(a)(1)(B),
>
> OR
>
> Equitable relief due to the insureds/claimants, cumulatively in the amount of $289,678, pursuant to 29 U.S.C. § 1132(a)(3);
>
> ii.    Attorney fees and costs of suit in connection with this action, pursuant to 29 U.S.C. § 1132(g)(1);
>
> iii.    All such other and further relief, as the Court deems appropriate, pursuant to 29 U.S.C. § 1132(g)(2)(E).

## VII.  <u>JURY REQUEST</u>

Abira Medical Laboratories, LLC, d/b/a Genesis Diagnostics requests a Jury on all issues in this Complaint.

## VIII.   <u>FIRST SET OF DISCOVERY REQUESTS</u>

Pursuant to FRCP 34(a)(1), Abira hereby requests that each Defendant produce following documents within FRCP 30 days, as allowed under FRCP 34(b)(2):

1. Each contract or agreement that is binding on each Defendant and Abira.

2. Each insurance policy or insurance plan that is relevant to each of the 110 claims underlying this Action, which Abira submitted to the Defendants, and is readily available to be re-sent to Defendants on a Microsoft Excel Spreadsheet.

3. Each document that indicates each insured's/claimant's receipt of the insurance contract or insurance plan along with its provisions.

4. Each document that indicates whether each of the insurance policies or insurance plans relevant to the 110 claims, is an ERISA plan.

5. A list of the insurance agents or salespeople who sold the insurance contracts or policies that are relevant to Abira's 110 claims.

6. Each document that is generated in connection with each of the 110 claims Abira submitted to Defendants.

7. Each document that evidences payment on each claim Abira submitted to Defendants, including but not limited to the claims underlying this Action.

8. Documents identifying the plan administrator who denied each of the 110 claims underlying this action.

9. Where the plan administrator is a third-party, produce each contract with each third-party-administrator, tasked with processing each claim Abira submitted to Defendants.

10. Each document indicating the training, experience, qualifications of the plan administrator who decided each claim that was denied or unpaid.

11. A list of each person who has ever worked on each claim Abira submitted to Defendants.

12. The entire claims file for each claim underlying this action, including but not limited to documents identifying who decided the claim.

13. Every document generated in connection with denying each claim Abira submitted to Defendants.

14. the appeals file for each claim underlying this action, including but not limited to documents identifying who decided the appeal.

15. Each document that Defendants generated in connection with each of Abira's appeal of denial, if any, or Abira's appeal of failure to pay claims submitted by Abira.

16. A list of representatives who communicated with Abira in connection with each claim Abira submitted to Defendants.

17. Every communication Defendants issued to Abira, in connection with each claim Abira submitted, including but not limited to electronic mails, letters, telephonic recordings, etcetera.

18. The names, address, and contact information for each insured for whom Defendants have denied each claim Abira submitted to Defendants.

19. The training manuals, policies, procedures, and protocols relied upon to decide each claim underlying this matter.

20. The training manuals, policies, procedures, and protocols relied upon to decide the appeal of each claim underlying this matter.

21. Each document indicating the establishment and maintenance of claim procedures for each insurance contract or insurance plan relevant to this matter.

22. Each document, policy, and guidelines, that support the decision to deny each claim Abira submitted to Defendants.

23. A list identifying which claims Abira submitted to Defendants are from ERISA plans, and which claims are non-ERISA plans.

24. Every internal communication generated in connection with each of Abira's claims, including but not limited to e-mails, letters, memos, etcetera.

## IX.  **DESIGNATION OF TRIAL COUNSEL**

Aderemilekun A. Omojola, Esq. is hereby designated as trial counsel for Abira Medical Laboratories, LLC, d/b/a Genesis Diagnostics.

Respectfully submitted,

Dated: October 13, 2023,          s/    Aderemilekun Omojola, Esq.
957 Route 33 | Suite 12 | #322
Hamilton Square | New Jersey | 08690
Tel: 212.220.1616 | Fax: 609.798.0327
aomojola@genesisdx.com
*Counsel for Plaintiff.*

## **CERTIFICATION PURUSANT TO LOCAL RULE 11.2**

Pursuant to Local Rule 11.2 I hereby certify that the matter in controversy, captioned above, is not the subject of any other action pending in any Court or arbitration proceeding, and it is not contemplated that the said matter in controversy shall be the subject of any other action or arbitration proceeding. To the best of my knowledge, all parties in this matter have been joined in the action.

Dated: October 13, 2023,          s/    Aderemilekun Omojola, Esq.
957 Route 33 | Suite 12 | #322
Hamilton Square | New Jersey | 08690
Tel: 212.220.1616 | Fax: 609.798.0327
aomojola@genesisdx.com
*Counsel for Plaintiff.*